## POSITION STATEMENT

Master Police Officer (MPO) Nicole Kosmas alleges in her EEOC Charge of Discrimination, No 437-2012-00274, dated August 7, 2012, that she has been subject to discrimination on the basis of her sex, female, in violation of Title VII of the Civil Rights Act of 1964 and been retaliated against due to making complaints of violations of Title VII. MPO Kosmas more specifically asserts that she is being harassed and treated disparately by management and colleagues. Additionally she claims she qualified in sniper training but has still not been appointed to the sniper cell. MPO Kosmas further asserts that since January 2012, she has been removed from the position of lead instructor, denied requested training, removed from conducting weapons training and was told she was being transferred off the team due to performance issues.

The City of Virginia Beach and Virginia Beach Police Department do not tolerate or condone discrimination or harassment of their employees on the basis of an individual's sex, race, color, religion, age, disability, sexual orientation, ethnicity, or national origin and are committed to maintaining a work environment free from discrimination, retaliation and harassment. The City has enacted policies mandating compliance with Title VII anti-harassment rules and setting forth its equal employment opportunity (EEO) directives. See Policy 4.02, Disciplinary Policy and Procedure; Policy 4.03, EEO Discrimination Complaints; Policy 4.04, Employee Grievance Policy and Procedure; Policy 4.05, Open Door Policy; Policy 6.06, Equal Employment Opportunity; and Policy 6.07 Employee Performance Feedback Report Policy in Attachment 4.

The Virginia Beach Police Department is nationally accredited by the Council for the Accreditation of Law Enforcement Agencies, CALEA. CALEA provides a comprehensive written directive system. Accreditation ensures that the department's application of services is efficient and effective, consistent with recognized best practices; requires a variety of reports and analyses for police leadership, enabling informed management decisions; improves relationships with the community by fostering more accountability and credibility; demonstrates commitment to excellence to the public and to staff and helps limit liability and risk exposure. At present, only twelve agencies within the Commonwealth of Virginia have earned this accreditation.

The Virginia Beach Police Department is committed to providing a safe community and improving the quality of life for all people. In meeting this objective, City directives and CALEA requirements, the department demands the highest professional standards and dedication to the department's core values. All employees are responsible to exemplify the following core values in the performance of their duties:

EXHIBIT 2

Charging Party: Nicole Kosmas
EEOC Charge #: 437-2012-00274

1. Professionalism;

2. Respect – for all citizens, each other, and for differing points of view, regardless of age, race, gender, appearance, individual beliefs, or lifestyles;

3. Integrity – truthful and honest, deserving of trust, ethical;

4. Dedication; and

5. Excellence – in everything we do.

See General Order (G.O.) 1.01 in Attachment #8. In addition, the Virginia Beach Police Department has further established its commitment to a workplace free of discrimination by adopting an internal policy prohibiting discrimination and harassment. See G.O. 2.06 in Attachment #8. Department core values, department policy, the City's equal employment and discrimination policies, and its Code of Ethics, direct all employees to treat each other with courtesy and respect and to refrain from discriminatory or harassing behavior. These polices also require all supervisors and managers who become aware of any undesirable behavior to take immediate action to stop the conduct and prevent a recurrence. See Attachments #7 and 8. See also City of Virginia Beach Code of Ethics in Attachment #6. The policies also expressly prohibit retaliation against any employee for filing a harassment or discrimination complaint. See Attachments #4 and 8. Employees of the Virginia Beach Police Department are cognizant of the City and department anti-discrimination policies. On an annual basis, Chief James Cervera, Male, distributes a memorandum to all departmental employees reminding them of the provisions of General Order 2.06 and the appropriate internal contacts with whom to address complaints of discrimination and/or harassment. See Attachment 12.

MPO Kosmas began employment with the City of Virginia Beach effective August 1, 2003 as a Police Officer Recruit. She progressed to Police Officer effective June 1, 2004 upon the completion of the Thirty-Sixth Virginia Beach Police Academy.[1] Officer Kosmas served at the Fourth Precinct on the midnight and evening shifts until January 1, 2009, when she competed for a position on the SWAT Team[2] and was selected for the Special Operations Unit/Swat Team.[3]

---

[1] MPO Kosmas sustained an injury in the Academy, thereby delaying her completion of the Academy.
[2] The SWAT Selection process includes a one day assessment. See SWAT Physical Performance Evaluation form outlining the physical portions of the selection process attached hereto as Exhibit A. Applicants recommended by the evaluators proceed to the SWAT School. See G.O. 2.04, Selection Process attached hereto as Exhibit B. At SWAT School their performance is evaluated and rated. From those ratings usually the one or two individuals with the highest ratings are selected to join the SWAT Team. MPO Kosmas first competed for a position on the SWAT Team in 2007. She was recommended to attend the SWAT School, but did not perform well enough to be selected

CVB 000043

Charging Party: Nicole Kosmas
EEOC Charge #: 437-2012-00274

The Virginia Beach Police Department SWAT Team is one of approximately four full time SWAT teams in the Commonwealth of Virginia. It was originally created in the mid 1970s. The SWAT Team is a specialized tactical unit utilized when there is a high probability of a life threatening situation or an armed encounter to neutralize threats and apprehend some of the most violent and dangerous With the Columbine tragedy in 1999 and the 2001 terrorist attacks, the SWAT team's scope and mission broadened and now SWAT develops and teaches the department's Rapid Response Training and its members are trained in nuclear, biological, and chemical environments; explosive breeching; threat assessment; and terrorist bombings as well as other areas of tactical response. See History of the Virginia Beach Police Department SWAT Team in the individual training records contained in Attachment 28. See also G.O. 2.04, Special Weapons And Tactics (SWAT) Team attached hereto as Exhibit D. When team members are not performing required continuing training or deployed on operations they support the Police Department mission by providing supplemental staffing for precincts, performing vulnerability assessments for critical resources, participating in warrant task force operations, assisting in extraditions, instructing in the Police Academy and other in service training and performing traffic operations. See Exhibit D. In order to excel in such high risk, life threatening situations it is essential that team members work together as a cohesive unit.

In order to prepare new members for the stresses encountered and highly technical tactics utilized on the SWAT Team all new SWAT Team members undergo a "probationary period" which includes rigorous specialized training and qualifications. Each new SWAT Team member is assigned a SWAT Training Officer (STO) to facilitate necessary training, evaluate performance, act as mentor and provide guidance on operations, gear and procedures. Like all new SWAT Team members, MPO Kosmas underwent this initial "probation period" and was assigned an STO. See Attachments 24 and 27. Her initial STO was MPO Brewer, male. MPO Brewer served as STO from January 1, 2009 through May 7, 2009. During this time period MPO Kosmas showed the ability to perform well in walk throughs and low stress mock situations. However, she failed to qualify with the .223 Carbine rifle, demonstrated poor decision-making, exhibited frustration during stressful situations, and had trouble accepting constructive criticism. See Attachment 27. MPO Kosmas was unhappy with MPO Brewer's

---

for the SWAT Team. See September 13, 2007 SWAT Officer Interview notes attached hereto in Exhibit C. She tried again in 2008 and this time was selected for the assignment.

[3] Prior to selection for the SWAT Team, MPO Kosmas was romantically involved with SWAT Team member, MPO Johnnie Mitchell. This was widely known by the members of the SWAT Team. Therefore, when MPO Kosmas was selected, Sergeant Vidrine approached MPO Mitchell to inquire whether this was going to be an issue. At that time, MPO Mitchell advised Sergeant Vidrine that they were no longer dating. However, more recently, at least a year or more ago, MPO Mitchell and MPO Kosmas began their romantic relationship anew.

3

assessment of her and informally complained about MPO Brewer protesting that they did not get along, he was too critical of her, and she didn't like his tone.

After the first four months of training, MPO Kosmas received a performance note dated May 1, 2009 from her supervisors, Sergeants Wilkerson[4] and Vidrine assessing her progress. The sergeants emphasized that she failed to qualify with the .223 Carbine despite additional training by MPOs Brewer and Mitchell and Sergeant Vidrine and that her close quarter combat (CQC) tactics were unsatisfactorily below that of her peers. She was required to continue attempts to qualify with the carbine until she at least met the required minimum standard and to improve her tactical skills. In order to provide her every opportunity to succeed particularly based upon her informal objections against her STO, the decision was made to assign MPO Chantland as her new SWAT Training Officer in an effort to provide a new training perspective with the hopes that would help her achieve the necessary improvement. See Attachment 27.

Beginning May 2009, MPO Chantland mentored and coached MPO Kosmas to develop and improve her skills and provide her the necessary tools to meet the required qualification standards. While MPO Kosmas excelled in vehicle takedowns and performed acceptably in less stressful trainings, MPO Chantland noted that she continued to be hesitant in decision-making during mock operations, had issues with negative body language, persistently failed to accept advice, and needed to improve handling of stressful situations which were typical of the operations the team would encounter. See Attachment 27. As required of all STOs, Brewer and Chantland[5] provided constructive criticism and feedback, both positive and negative, to help MPO Kosmas bring her skills and performance to a satisfactory level in order to be a successful and productive member of the team. Yet, MPO Kosmas did not appreciate their efforts and was unwilling to acknowledge mistakes and consider guidance provided from these more tenured team members. Instead, again, she complained that she did not get along with MPO Chantland, didn't like his tone, didn't like the way he critiqued her and felt he was hyper critical.

In order to provide even further assistance, training, and guidance to bring her level of performance and understanding of the SWAT Team dynamics to an acceptable level, it was decided to allow her the opportunity to work with another STO. Understandably, given the nature of the work the SWAT team is expected to perform, the majority of team members are A type personalities with extremely high expectations of themselves and their fellow team members and a lack of patience for individuals who refuse to accept feedback and responsibility for their own actions. However, there was one

---

[4] Sergeant Wilkerson was promoted to Lieutenant effective January 16, 2012.
[5] MPOs Brewer and Chantland became members of the SWAT Team in 2004 and had approximately five years of experience when MPO Kosmas joined the team.

CVB 000045

member who was more of a B type personality, MPO Shawn Aitken who was fondly referred to as "Chaplain". Accordingly, in approximately September 2009 MPO Aitken began serving as her STO. Despite MPO Aitken's cordial and tolerant demeanor and additional efforts, after a couple of months he alerted then Sergeant Wilkerson that he could not train MPO Kosmas because she refused to accept his feedback.[6] MPO Kosmas' continuous defiance created distance and discord between her and some of the other members of the SWAT Team from the very beginning.

In spite of her resistant attitude, with numerous retraining and additional opportunities to qualify with specialty weapons, and the, albeit unwanted, input from all members of the team, MPO Kosmas did eventually meet the minimum qualification standards and became a full SWAT member in late 2009 or beginning 2010 and was issued her SWAT pin. Additionally, during this time she successfully completed the Master Police Officer written test and sought career progression to MPO. See Attachment 22. Her request was supported by then Sergeant Wilkerson and her command. See Attachments 19 and 20. Based upon her meeting the eligibility requirements and the commands recommendation, then Police Chief A. M. Jacocks[7], male, requested that Officer Kosmas be advanced to the rank of MPO. See June 29, 2009 memorandum in Attachment 19. This request was approved by the Human Resources Director[8] and Kosmas was progressed to the rank of MPO on August 1, 2009. See Attachment 19.

Although generally MPO Kosmas' evaluations through her tenure have been positive and complimentary of her strengths, it has been noted that she still struggled with developing her tactical knowledge, skills and abilities and to accept constructive feedback. See 2010-2011 evaluation in Attachments 19 and 20. MPO Kosmas, like all SWAT Team Members, attended and continues to attend weekly SWAT training as part of ongoing efforts to not only maintain but increase essential knowledge, skills and abilities. Team members, including MPO Kosmas, are also afforded opportunities and encouraged to attend training outside of the Police Department. See Attachments 19 and 24. MPO Kosmas attended Response to Active Shooter Training at Portsmouth Police Department April 5-6, 2010; Shoot House Instructor Training at the US Training Center in Moyock, NC July 14-July 15 2010; Incident Response to Terrorism Bombing in New Mexico February 14-18, 2011; ACAMS Operation Threat Assessment Training May 9-13, 2011; Carlos Hathcock Counter Sniper School October 17-29, 2011[9]; and

---

[6] As a last effort, Sergeant Wilkerson assigned then MPO Willis who was the second most senior member of the team at the time, MPO Johnnie Mitchell being the first, as her fourth STO. However, within a month he was promoted to Sergeant and transferred to the Second Precinct, therefore he did not have an opportunity to serve as STO for her.
[7] Chief Jacocks retired effective June 30, 2010. Thereafter, Deputy Chief James Cervera became acting Chief July 1, 2010 and was selected as the new Police Chief effective September 1, 2010.
[8] The Human Resources Director at the time was Fagan Stackhouse, male.
[9] MPO Kosmas passed the sniper school and became an alternate sniper.

CVB 000046

ACAMS Operation Threat Assessment Training September 16-18, 2011.[10] See Attachment 24.

Despite these training opportunities, in the second half of the most recent reporting period her new supervisors[11] observed that MPO Kosmas was unable to satisfactorily perform basic SWAT operations, continuously refused to take any responsibility for mistakes and was totally opposed to all forms of constructive criticism. Of particular note, MPO Kosmas had an accidental discharge on her first sniper training following completion of the Carlos Hathcock Sniper School where she fired a round 15 yards into the ground in front of her when trying to shoot a target 100 yards away. See February 16, 2012 memo attached hereto as Exhibit Y. During a high risk search warrant MPO Kosmas failed to clear or check under a bed on her side of a room until another team member asked if she thought she should check under the bed. See April 1, 2012 memorandum attached hereto as Exhibit E. MPO Kosmas while aggravated at being called out by a team member did end up clearing the bed; however, her lack of focus and failure to perform a basic search function to render an area safe could have led to dire circumstances. This error was even more disturbing because the command drilled the importance of searching every nook and cranny before clearing a room to prevent serious injury or death due to an embarrassing mistake a couple months prior when a man was left in an attic with access to several weapons even though the area was supposedly cleared by the SWAT Team.[12]

Then on or about April 19, 2012, in the midst of a high risk SWAT operation Sergeant Willis while maneuvering a remote robot in an attempt to locate the position of a potential armed suspect instructed MPO Kosmas, as a backup, to get the 40 mm launcher and be ready to knock out a window. MPO Kosmas became confused, did not know where the 40 mm launcher was, and started asking questions about the basic operation of the weapon such as how to load it even though the team had just received training on the 40 mm launcher four months prior. Unquestionably, it is integral that

---

[10] Although outside the relevant period, she also requested and was approved to attend The Woman in Law Enforcement Seminar in Chesapeake, Virginia September 21, 2012. See Attachment 24.

[11] In December 2011 Sergeant Willis came back to the SWAT Team as a Sergeant after eleven years on the team as an MPO, Lieutenant Ben Gonse was re-assigned to SWAT after serving approximately fifteen years previously as an officer and Sergeant, and in March 2012 Sergeant Thomas Shattuck was assigned to the SWAT Team for the first time after serving as a Homicide detective. See SWAT Team chronology of supervisors during the relevant period attached hereto in Exhibit F. These new supervisors not surprisingly had different supervisory styles and expectations than the prior chain of command. Lieutenant Gonse and Sergeant Willis met with the team members and forwarded written expectations in an attempt to create a smooth transition. See memo dated January 17, 2012 attached hereto as Exhibit G. Additionally, when Sergeant Willis returned to SWAT he met with MPO Kosmas to ensure things were going well and to try to engage her. Unfortunately, the new command began to observe mistakes of basic operations during high risk calls by MPO Kosmas that were unexpected from a third year member and disturbing behavior towards supervisors and peers.

[12] MPO Kosmas and MPO Mitchell were initially responsible for clearing the upstairs and attic of the house, but missed the man.

team members know the ins and outs of the weapons and not only is it unacceptable for MPO Kosmas to even momentarily freeze in the middle of an operation, but it diminishes the team's trust and confidence in MPO Kosmas' abilities.

Approximately a week later, on April 25, 2012, MPO Kosmas once more was unable to acceptably perform a standard diversionary tactic frequently employed by the SWAT Team. In this instance, she was specifically tasked by Sergeant Shattuck with using a bang pole to deploy a flash bang[13] during the performance of a high risk warrant. She initially tried to put off the task on another officer, but was required to follow the sergeant's directions. Although MPO Kosmas did deploy the flash bang through a front window, she did so only after teammates were already inside the house and in front of the same window not only defeating the purpose of the flashbang, but putting her teammates at risk of serious injury from the onslaught of glass and debris. Even more basic, she failed to wear her protective goggles until noticed by Sergeant Willis once inside the house and directed to put them on. While the SWAT Team has repeated that mistakes happen, MPO Kosmas' persistent lack of accountability for errors in operation undermines her effectiveness as an officer and ability to be a successful member of the team. In this case, instead of admitting her actions or lack thereof had any bearing on the outcome, at the debrief with the team she refused to accept any responsibility for deploying the flashbang on her teammates and blamed the action on equipment failure.[14] MPO Kosmas unremitting failure to accept responsibility for her actions continues to further diminish her teammates' faith in her abilities when each of their lives are dependent on every member of the team.

The already fragile relationship between MPO Kosmas and her teammates has been further hindered by MPO Kosmas' attitude towards her peers and supervisors and her clandestinely recording conversations with her teammates. She has flat out refused to work with certain team members, is detached, disrespectful, and argumentative. Even before the specific circumstances aforementioned occurred, at a training on January 11, 2012, which is now the subject of her Charge of Discrimination, MPO Kosmas outright refused to instruct with Assistant Team Leader[15], MPO Ferreira, thereby interrupting the afternoon training of the team. Additionally, MPO Wolfe another assistant team leader was confronted by MPO Kosmas on March 8, 2012 for several hours.[16] See March 20,

---

[13] The purpose of the flash bang is to deploy ahead of entry into a dwelling in order to distract possible armed suspects in the building so that team members can enter hopefully without coming under fire.

[14] The next day Sergeant Willis directed Sergeant Shattuck and MPO Knabb, the flashbang instructor, to test the exact flash bang to determine if it was faulty. They found it to be in working order.

[15] Assistant Team Leaders assist the sergeants with accountability of the officers, administrative duties and training. Assistant Team Leaders have no authority over the other members of the team, but usually are the more senior members and also act as mentors or coaches.

[16] Due to the lengthy conversation initiated by MPO Kosmas they ended up being about an hour late to a stakeout that evening.

7

CVB 000048

Charging Party: Nicole Kosmas
EEOC Charge #: 437-2012-00274

2012 memorandum attached hereto as Exhibit H. MPO Wolfe, a seven year member of the SWAT Team, was disturbed by comments made in the course of the discussion. While he tried to instill the importance of trust, respect and team unity, MPO Kosmas responded it did not matter because she met the standards, reiterating several times that she had to be accepted because she met the standards and if the team did not trust her that was their problem to fix. MPO Kosmas' response epitomizes her persistent dismissal of the team concept and unwillingness to accept that her actions contribute to the morale and cohesiveness of the team which then affects the team's effectiveness and comfort level engaging in life threatening situations.

Even in minor interactions with team members issues arose. For example, on May 3, 2012, MPO Knabb was instructed to retrieve a sniper rifle from MPO Kosmas.[17] When he approached her in the parking lot to get the rifle she inexplicably was curt and flippant throwing items around in her trunk when providing MPO Knabb the rifle.[18] See Memo from MPO Knabb attached hereto as Exhibit I. The sergeants found out about this incident and before Sergeant Shattuck could address the situation with her, she took it upon herself to instigate a lengthy phone call to MPO Knabb on his cell phone on May 6, 2012 to confront him while secretly recording the conversation. See copy of MPO Kosmas' recording of the conversation attached hereto as Exhibit J. During the call she was very upset, emotional, and argumentative. Although she admitted to being "pissed" about another issue at the time he asked for the rifle, at no time did she apologize for her frustration and attitude during the rifle exchange or acknowledge that it might have been inappropriate.[19] Rather she blamed him for what she believed was a misplaced perception that she was mad at him for asking for the rifle. See recording in Exhibit J.

A couple of days later on May 5, 2012, Sergeant Shattuck[20] met with MPO Kosmas to discuss the recent performance issues. MPO Kosmas also surreptitiously recorded this conversation with her Sergeant. See copy of recording attached hereto as Exhibit J. Sergeant Shattuck attempted to review the circumstances surrounding the flashbang incident and the sniper rifle exchange impressing that it is unprofessional and inappropriate to respond to direction with nasty, aggravated and disgusted looks which he noticed when he ordered her to deploy the flashbang. She immediately became defensive reasoning that she had other things on her mind and was not reacting to his direction.[21] Towards the end of what turned into a lengthy conflict she further

---

[17] Both MPO Kosmas and MPO Knabb are the alternate snipers on the team and share a sniper rifle. Sergeant Willis had directed MPO Knabb to retrieve the rifle from MPO Kosmas.
[18] This incident got back to Sergeant Willis who inquired further into the situation.
[19] MPO Knabb did apologize in the conversation.
[20] Sergeant Shattuck was only assigned to SWAT in March 2012.
[21] Again, focus during a high risk operation is critical. Her admission that her concentration was elsewhere to such a degree that it was interfering with her ability to respectfully respond to orders is very disturbing and intolerable.

CVB 000049

Charging Party: Nicole Kosmas
EEOC Charge #: 437-2012-00274

sarcastically snapped what did he want her to do dress in pigtails and pom poms, say yes sarge and jump up and down whenever he gave an order. During the extended row MPO Kosmas was argumentative, loud, cut off her sergeant and spoke over him. Sergeant Shattuck reiterated his direction several times and requested that she stop yelling; however, she continued her barrage and became very emotional. Even more concerning was her confession that she did not trust anyone, didn't need to be part of the team and belief that if it was a teammates "time" she couldn't control that.

Her insolent attitude towards her sergeant continued thereafter. Another argument ensued on or about June 30, 2012 between MPO Kosmas and her sergeants which yet again MPO Kosmas secretly taped. See recording by MPO Kosmas attached hereto as Exhibit K. An Assistant Team Leader prepared a lineup for beat patrol for the upcoming holiday weekend at the Oceanfront. The sergeants made a change to the lineup moving MPO Kosmas and another officer's assignment.[22] MPO Kosmas was reassigned to work with Officer Bryan Nodley at 18th Street at the Oceanfront. MPO Kosmas became irate and tearful over the change and contested the decision. Her behavior towards her sergeants in opposition to the change was belligerent, brash, and insubordinate.[23] See recording of conversation by MPO Kosmas attached hereto as Exhibit K. MPO Kosmas then went above the Sergeants to Lieutenant Gonse. While she was more respectful to the lieutenant[24] despite her initial reasoning that she wanted to walk with MPO Mitchell, her boyfriend, she argued that she was always assigned to 18th Street, "stuck" with Officers Curtis and Nodley[25] and that the bars and people were "different" on that block.[26] Lieutenant Gonse ultimately switched her and MPO Mitchell so she worked 24th Street instead of 18th street that weekend. See copy of recording by MPO Kosmas or conversation with Lieutenant Gonse attached hereto as Exhibit K.

MPO Kosmas also missed court on July 18, 2012 where three criminal charges against a perpetrator for urinating in public, underage possession of alcohol and drunk in public, were dismissed without prejudice due to her failure to appear. And, she was counseled

---

[22] For the July 4th holiday weekend, the SWAT Team was patrolling at the oceanfront and members were assigned in pairs at certain streets. MPO Kosmas and MPO Mitchell, who have been dating for a while, were originally assigned together. The Assistant Team Leader did not send the lineup to the sergeants first so they did not know in advance of the placement. The sergeants had concerns about their personal romantic relationship interfering with their ability to react if an emergency presented itself. Therefore in order to protect both officers and prevent any potential liability on the City, it was decided that they would be assigned new partners.

[23] She retorted that she was "tired of being assigned with the bottom of the barrel" referring to Officer Nodley and was looking forward to working with MPO Mitchell, her boyfriend.

[24] It is believed that MPO Kosmas reaction to the Lieutenant differed from the Sergeants because he placed a tape recorder of his own on the table and also recorded the conversation.

[25] Curtis and Nodley were assigned to SWAT in 2011.

[26] Any police officer should be able to patrol any part of the oceanfront without objection not to mention a SWAT Officer trained in special tactics. It is even more disturbing since the area MPO Kosmas was describing as "different" includes mostly establishment with predominantly African Americans patrons.

CVB 000050

Charging Party: Nicole Kosmas
EEOC Charge #: 437-2012-00274

for failing to maintain a department hand held radar gun. MPO Kosmas obtained a radar gun from the second precinct, failed to sign out the equipment in the proper book, and kept the equipment for approximately ten months[27], even after department emails were sent out searching for the radar gun and the department ended up writing off the equipment. In the end, when she finally returned the radar gun by placing it on a desk at the second precinct and trying to quickly leave, it turned out the radar gun was broken. See IA Investigative Summary attached hereto as Exhibit L. See Sergeant Willis handwritten notes regarding conversation with MPO Kosmas attached hereto as Exhibit M.

Due to the unsatisfactory performance, intolerable attitude, disrespectful and antagonistic behavior, and lack of accountability the sergeants recommended transfer from the SWAT Team. See July 1, 2012 recommendation for transfer package attached hereto in Exhibit N. The contemplated transfer was in no way related to MPO Kosmas' gender or allegations made against any specific former or current SWAT Team member. The concerns and observations were reviewed with the chain of command and originally approved. Captain Glendon then met with MPO Kosmas. At that time she was provided an option of transferring to another specialty unit within the Special Operations Division, the Traffic Safety Unit, or to go to a precinct of her choice. Either assignment would have been a lateral transfer with no change in title, salary or benefits and the traffic safety assignment would have provided her an opportunity to broaden her experiences in another specialty unit while remaining in Special Operations. Similar to SWAT, the Traffic Safety Unit mission exceeds the normal functions of a police officer. The Traffic Safety Unit aggressively addresses, detects and apprehends impaired drivers utilizing roving patrols and planned sobriety checks, as well as promoting safety through citizen education and prevention programs. See Traffic Safety Unit Mission in the Transfer Training Template attached hereto as Exhibit O.[28]

Ultimately, however, the transfer did not occur. At the time, MPO Kosmas was represented by legal counsel, Kevin Martingayle, and through her attorney requested a meeting before the transfer was finalized.[29] Chief Cervera agreed to meet with MPO Kosmas, her attorney, and a representative of the City Attorney's Office. In that meeting MPO Kosmas was provided an opportunity to present additional information to

---

[27] When first confronted about the radar gun by Sergeant Willis she indicated she signed the radar gun out in September/October 2011 and forgot to bring it back. However, when interviewed by internal affairs she admitted signing out the radar gun in May 2011 then claimed she put it in her gear bag and forgot about it until September/October 2011 and then forgot about it again. Nevertheless, records revealed that MPO Kosmas wrote summonses for speeding using a radar gun during the time she possessed the missing radar gun and she did not sign out any other radar gun to utilize. Again, her failure to be forthright with her supervisors has significantly impacted their impression of her character.

[28] This was the most recent member of the Traffic Safety Unit's transfer template.

[29] Kevin Martingayle has reported that he no longer represents MPO Kosmas

10

Charging Party: Nicole Kosmas
EEOC Charge #: 437-2012-00274

the Chief for consideration. She argued that she was not provided sufficient warning of any problems.[30] After further review by the Chief of Police, although there had been extensive informal efforts to correct the performance issues displayed by MPO Kosmas with additional training and coaching, formal performance management tools such as a performance improvement plan (PIP) had not been utilized. Therefore the Chief chose to provide formal notice of her performance and behavior issues using performance management tools thereby affording her time to improve her performance and correct her inappropriate behavior. This resolution was offered through her then attorney and according to him agreed to by MPO Kosmas. Therefore, at this time MPO Kosmas remains a member of the SWAT Team.

Unfortunately, MPO Kosmas' attitude has not improved. Instead there has been a further decline. For instance the team was required to report at a specified time at the gym for training. MPO Kosmas was in the parking lot on her phone twenty minutes after the scheduled report time. When Sergeant Willis approached her she rolled her eyes at him, became annoyed that he interrupted her phone call, and was utterly dismissive of his direction to join the team in training. On August 23, 2012 Sergeant Willis received a complaint from Sergeant Wilson of the North Carolina State Highway Patrol that he clocked a blonde female SWAT member traveling 50 in a 35 and noticed she was on the phone at the time.[31] See email and IA 2012-191 interview transcripts attached hereto as Exhibit Z. While complaints of speeding are generally not a major issue the Virginia Beach Police Department had to obtain special permission to drive their vehicles while armed to the training facilities in North Carolina and have knowledge that there have been several fatal crashes on that stretch of road. This complaint was forwarded to Internal Affairs whose investigation is pending at this time.[32] See Exhibit Z. On or about September 5, 2012 MPO Wolfe and MPO Ferreira were conducting team training and decided to incorporate a basketball game as a team building exercise with each being a captain. On a prior occasion MPO Kosmas had complained that she was always picked last, so MPO Ferreira cognizant of this concern had the members line up and sign off 1, 2 to make the two teams. MPO Kosmas was standing next to her boyfriend, MPO Mitchell, and per the original sign off ended up on MPO Ferreira's team while MPO Mitchell was on MPO Wolfe's team. MPO Kosmas was annoyed at being on MPO Ferreira's team and snapped "thanks for looking out for me Johnnie" in front of the other team members. In response MPO Cocca offered to switch teams. Then during the game MPO Ferreira, now on the opposing team, noticed MPO Kosmas had the ball

---

[30] Even in this meeting she failed to concede any deficiencies in her performance.
[31] MPO Kosmas is the only blonde female SWAT officer.
[32] Interestingly, in her IA interview MPO Kosmas admitted that she matched the physical description offered by the N.C. Sergeant, but refused to admit or deny that it could have been her driving the unmarked vehicle. Her response made this a bigger deal than required for if she just admitted the conduct and apologized, in all likelihood nothing would come of it.

11

CVB 000052

and was not being covered. So he walked up to cover her and she said "get the F off of me!" MPO Ferreira backed off to avoid a further confrontation, but this caused a very uncomfortable situation in what was intended to be a fun team building game. See Memo from MPO Ferreria attached hereto as Exhibit P. The next week, a new team member, Officer Cain, earned his five year service pin. At muster he was awarded the pin in front of the team. All the teammates except MPO Kosmas cheered this milestone. MPO Kosmas sat in the front row with her arms crossed over her chest and an aggravated look on her face. Again, by virtue of MPO Kosmas' own standoffish and rude behavior and open discomfort with other team members she has created an uncomfortable atmosphere for all members which is not conducive to the requisite team cohesion needed to effectively perform as a SWAT Team.

MPO Kosmas' 2011-2012 performance evaluation has documented these observed performance and behavior issues during the reporting period.[33] See Attachment 19. Additionally, pursuant to the agreement with her attorney, MPO Kosmas was placed on a performance improvement plan (PIP).[34] See PIP attached hereto as Exhibit Q. It is the sincere hope of the department that these additional efforts will achieve improved performance and allow MPO Kosmas to be a successful member of the SWAT Team. These documents were reviewed with MPO Kosmas on Thursday, September 13, 2012. Regrettably, MPO Kosmas became irritated, emotional, talked over her supervisors, and tried to re-direct their attention to other team members' performance. See copy of recording attached hereto as Exhibit R.[35] Not surprisingly, she continually failed to acknowledge any deficiencies and disputed every critical evaluation of her performance as evidenced by her note "I Do Not Agree With Content" written above her signature. See Exhibits Q and R. As of September 20, 2012, since the meeting with her chain of command she has called in sick all but one day.

Even if MPO Kosmas was reassigned to the Traffic Safety Unit as considered, the basis was wholly unrelated to MPO Kosmas' gender and would not have been an actionable adverse employment action. A transfer is only actionable adverse employment action if the reassignment has some detrimental effect on the terms and conditions of employment. Absent any decrease in salary, job title, level of responsibility, or

---

[33] The evaluation was not totally negative, it also credited MPO Kosmas on her successful completion of sniper school and utilizing her Department of Homeland Security Automated Critical Asset Management System to conduct threat assessments on the 31st Street Hilton hotel and five elementary schools, as well as researching and testing a new carbine rack fro SWAT vehicles and instruction of several department trainings. Moreover, the overall evaluation found her to meet standards.

[34] In addition to the PIP efforts to repair the interrelationships and trust between the team members which is critical in the high risk operations performed by the team have been pursued including requiring team members to attend a team building training specifically prepared by Human Resources for the SWAT Team. See email with attendees and copy of training materials attached hereto in Exhibit S.

[35] Lieutenant Gonse, Sergeant Willis and MPO Kosmas recorded this conversation. The copy is of Sergeant Willis' recording.

CVB 000053

opportunity for advancement, a transfer to a position commensurate with the employee's current salary is not an adverse employment action. Unquestionably, MPO Kosmas did not seek a transfer and was unhappy with transferring even to another Special Operations unit. However, a transfer from one specialty unit to another in the same command is not a demotion and would not have changed MPO Kosmas' title, salary, level of responsibility or chances for advancement. Quite to the contrary, having further specialty experience could only benefit her resume. Therefore, even if transferred to the Traffic Safety Unit, there is no evidence that the action would have been based upon a malicious motive in violation of Title VII and such a transfer could not be considered actionable adverse employment action, even if it did occur.

Moreover, at no time, did the department impose any form of discipline, yet alone a demotion. See Attachment 19. Pursuant to City Code §2-111 and the Human Resources Demotion Policy a disciplinary demotion is defined "as an assignment to a new classification with an assigned pay range lower than the assigned pay range for the employee's present classification as a result of disciplinary action." See Attachments 4 and 9. MPO Kosmas' classification as of August 2009 is Master Police Officer and she continues to be a Master Police Officer to this day with no decrease in salary during the relevant time period.[36]

During her tenure with the SWAT Team MPO Kosmas has also been afforded ample training both through the Police Department and outside agencies. As aforementioned she requested and attended the following training in addition to the requisite SWAT training: Department of Criminal Justice Services Firearms Instructor School, High Risk Warrant Service School, Response to Active Shooter Training at Portsmouth Police Department April 5-6, 2010; Shoot House Instructor Training at the US Training Center in Moyock, NC from July 14-July 15 2010; Incident Response to Terrorism Bombing in New Mexico February 14-18, 2011; ACAMS Operation Threat Assessment Training May 9-13, 2011; Hathcock Counter Sniper School October 17-29, 2011; and ACAMS Operation Threat Assessment Training September 16-18, 2011. See Attachment 24. In spite of her naked contentions to the contrary, a review of department records fail to reveal that any of MPO Kosmas' requests for training have been denied during the relevant period.

Not only has MPO Kosmas attended a variety of training, she has served as an instructor for various SWAT, Academy and other department training. See Attachment

---

[36] Due to budgetary constraints there have not been merit increases in the last few years. However, there has been one small general increase. So, like other City employees, MPO Kosmas' salary may have increased slightly the last couple of years.

CVB 000054

19. See also Department Personnel File in Attachment 20. Her 2009-2010 evaluation[37] documented that she instructed in-service training and the Immediate Action/Rapid Response, Building Searches in the Recruit Academy, and Officers Safety Tactics training. See Attachment 19. She also served as instructor for Roger's Range Handgun training April 13, 2011; Carbine training June 1, 2011; Transition Drills/Barricades training August 3, 2011; Handgun/Movement Drills September 21, 2011; Handgun/Carbine training October 5, 2011 and December 30, 2011; Basic Handgun-CQC training January 11, 2012 and Bus Assaults – CQC April 11, 2012. Various SWAT Team members are assigned to instruct a variety of courses dependent on their qualifications, instructor certifications, tenure and expertise. As with any agency practices in SWAT are re-evaluated and updated periodically as needed. One such change occurred in the end of 2011 due to recognized deficiencies and gaps in SWAT training. At that time a decision was made to have the more senior members and assistant team leaders act as instructors with other team members assisting in order to ensure consistency in training.

With regard to the training on January 11, 2012, which is the subject of MPO Kosmas' Charge of Discrimination, MPO Kosmas also raised this issue to her supervisors and it was the subject of an Internal Affairs inquiry and made a part of her internal complaint to Human Resources. See IA 2012-011 summary attached hereto as Exhibit T. On the day in question, MPO Schmid, male, and MPO Kosmas were scheduled to instruct handgun training for the SWAT Team at the Academi training facility in Moyock, North Carolina. The original training plan did not include Live Fire CQC Training in a shoot house which entails the SWAT team entering a dwelling and practicing tactical drills with live fire. However, just before lunch a shoot house became available and the plan changed to allow the team to take advantage of the shoot house. The Assistant Team Leaders present were MPO Ferreira, MPO Bitner and MPO Curran. The Assistant Team Leaders had previously been directed by the chain of command that at least one Assistant Team Leader or a supervisor needed to act as instructor particularly when performing live fire CQC training. Although this directive had not yet been disseminated to the entire team, MPO Curran in compliance with the order decided with MPO Ferreira that they would each instruct half the CQC training with either MPO Schmid and/or Kosmas. MPO Curran then advised MPOs Schmid and Kosmas of the new directive. Given that they did not need three instructors he left it up to them to decide who would continue as instructor. Based upon MPO Kosmas' preference it was determined that she would continue as instructor that afternoon. Thereafter, MPO Kosmas spoke individually with MPO Curran insisting that she was uncomfortable instructing with MPO Ferreira. MPO Curran informed Ferreira that he would assist MPO Kosmas with the

---

[37] This evaluation was prepared by Sgt. Mark Vidrine who is no longer a member of the SWAT team and approved by then Lieutenant, now Captain Michael Ronan who is currently Captain of the First Precinct.

14

entire afternoon of training; however, when MPO Ferreira inquired why, MPO Curran confided that MPO Kosmas did not feel comfortable training with him. MPO Ferreira disagreed with this outcome and was adamant that they needed to work through any problems because the nature of their work required that they be able to rely on one another. MPO Kosmas was late returning from lunch due to other obligations and while the team was waiting for her MPO Curran and MPO Ferreira began the training session. When that initial block of instruction was concluded MPO Curran attempted to turn the training back over to MPO Kosmas, but she refused. MPO Curran and Ferreira then resumed the training, but MPO Kosmas interrupted to speak privately with MPO Curran. After a lengthy, heated discussion with him reiterating her refusal to teach with MPO Ferreira, MPO Ferreira on his own stepped outside for the rest of the training to avoid further confrontation and allow MPO Curran and MPO Kosmas to finish the remainder of the training. This whole episode occurred in the presence of most, if not all, of the SWAT Team members. See Memoranda regarding training incident attached hereto as Exhibit U. Regardless of MPO Kosmas' perception, there is no evidence that the change in instructors related to her in any manner. Rather this was a command decision to ensure consistency in the high stress tactics learned and practiced in the shoot house. While it would have been preferable to notify all SWAT members of the modification to policy prior to the training, the addition of the CQC training was a last minute alteration to the original training plan which was not anticipated in advance. Not to be forgotten is the fact that MPO Kosmas was not removed from instructing the training. Rather deference was given to her preference to remain one of the instructors that day. The only person that caused her not to act as instructor for an approximate forty five minute period was herself when she initially refused to instruct and then used the time to confront MPO Curran.

Moreover, even though MPO Kosmas believes that she is entitled to assignment as a sniper because she has successfully completed the Carlos Hathcock Counter Sniper School, successful completion of the school is only one consideration in placement as a sniper. The Sniper Cell recognizes SWAT Officers as official snipers for the team. Such an assignment is not a promotion and does not provide additional pay, a change in title or any other employment benefit. Sergeant (now Lieutenant) Wilkerson, who is one of the subjects of MPO Kosmas' internal complaint, actually advocated for MPO Kosmas to attend this training. He viewed it as a great opportunity for her. MPO Kosmas attended the 2011 Carlos Hathcock Sniper School with MPO Cherwa, MPO Thorson and Officer Knabb. The qualification course consists of three phases each of which must be completed with a score of 100 percent. If one or more of the phases are not passed, the student is allowed to reshoot that phase once. If the failed phase is passed on the second attempt the student passes the qualification, if not then he/she must wait thirty days to retry. This is a pass or fail course of fire.

CVB 000056

MPO Cherwa qualified on his first try and having finished first overall was placed on the sniper cell after completing the school. The other three officers, including MPO Kosmas, failed both rounds of the barricade run and had to wait thirty days to try again. On the repeated qualification all three passed. Regardless of MPO Kosmas' opinion, this was never intended as a competition between the four Officers to fill the sniper vacancies. Because three of the students did not qualify initially, the Special Operations chain of command did debate about who would fill the second vacancy after successful completion of the school.

In the end, the decision as to who will or will not be on the Sniper Cell is vastly more complex than a matter of simply meeting the minimum requirements to pass the sniper school. Emotional intelligence and equanimity under stress, performance on the SWAT Team, and tenure are all factors taken into consideration. The command must have confidence that the team member will be able to carry out a directive to take out a threat without hesitation, question or emotion and perform the task safely and accurately. Upon consideration of these factors to determine which of the three officers should be formally identified as a team sniper, the command identified MPO Thorson as sniper. MPO Thorson is more tenured than both MPO Kosmas and Officer Knabb. See Portions of Thorson's Official Personnel File attached hereto in Exhibit V.[38] See also Portions of Thorson's Department Personnel File attached hereto in Exhibit W. In addition, he has displayed greater emotional intelligence and poise under stress than MPO Kosmas who unfortunately has repeatedly demonstrated difficulty with composure and decision-making under stress. See Exhibits V and W. Additionally although she did ultimately meet the minimum requirements to pass the school, then Sergeant Wilkerson received verbal feedback from the two primary instructors indicating that MPO Kosmas failed to accept constructive feedback. Besides the performance issues previously mentioned, MPO Kosmas had a major safety violation during a SWAT callout during the summer of 2011.[39] MPO Kosmas was assigned to provide lethal cover for the SWAT Team while positioned in the turret of the Bearcat. Forty-five minutes into the operation while the Team was relying on MPO Kosmas to provide lethal cover then Sergeant Wilkerson noticed she had the bolt of the rifle locked to the rear thus making it inoperative. Consequently, MPO Kosmas failed to actually provide any cover, not to mention lethal cover, during that forty-five minute period and placed her teammates at grave risk unnecessarily. This was yet another example of an inexcusable lack of focus, firearms awareness, and appreciation for the gravity of her mistake especially given MPO Kosmas' training and tenure.

---

[38] Please note that MPO Thorson's payroll records have not been included in these documents.

[39] MPO Kosmas was not disciplined for this action. Rather this was addressed on site and in debrief. Although the issue was brought to MPO Kosmas' attention she still refused to admit responsibility for her actions.

16

Charging Party: Nicole Kosmas
EEOC Charge #: 437-2012-00274

Even so, MPO Kosmas and Officer Knabb were still both assigned as alternate snipers and attend continuing sniper training. However, after MPO Kosmas was identified as an alternate sniper at the first sniper training in February 2012 she has an accidental discharge with her weapon. This is illustrative of issues with firearm performance during her tenure and epitomizes the concerns her command has with naming her as an official team sniper. While MPO Kosmas clearly disagrees with this decision, the facts are void of any evidence that the decision was based in any manner on her gender or claims of harassment. Rather her, own, observed shortcomings and inappropriate behavior dictated the ultimate outcome.

The City and Police Department take all allegations of discrimination, harassment and retaliation very seriously. Since her initial acceptance on the SWAT Team MPO Kosmas has made numerous complaints against specific SWAT Team members ranging from personality clashes and perceived malicious intent of minor issue such as bumping into someone on a mission and giving an officer a pen; to bullying and reporting one offensive email. All her complaints have been reviewed formally or informally and most have concluded to her benefit even though there has been no finding of harassment or discrimination based upon her gender. These complaints began almost immediately upon her selection to SWAT when she complained informally about her first STO, MPO Brewer, disliking his tone, and believing he was too critical of her performance. MPO Kosmas was provided a second STO, MPO Chantland and within a few months she made similar complaints about him resulting in another change in her STO. Then more recently in March 2011 she raised a complaint regarding MPO Ferreira with regard to a blonde female joke he forwarded via email to the entire team.[40] This complaint was investigated and MPO Ferreira was counseled regarding the use of City email and more specifically on the harmful effects of offensive and inappropriate jokes in the workplace. See IA NO 2011-058 attached hereto as Exhibit X. Since, there has been no similar occurrence by MPO Ferreira or any other SWAT Team member. Shortly thereafter, in approximately June 2011, MPO Kosmas also made specific allegations regarding MPO Ferreira, MPO Chantland and now Lieutenant Wilkerson to her command and after being advised of the options to pursue the allegations she submitted a nineteen page complaint with Human Resources. See Attachment 16. Pursuant to Human Resources' Equal Employment Opportunity (EEO) Policy 6.06 and the City's EEO Complaint Procedure Human Resources began an investigation of Ms. Kosmas' complaints until MPO Kosmas conveyed improvement due to the promotion and transfer of MPO Brewer and transfer of MPO Chantland.[41] At the time she did not want Human Resources to pursue an investigation and revive old

---

[40] The joke originated from a female civilian employee.
[41] At this time, then Sergeant Wilkerson, Sergeant Hatfield and Lieutenant Smith comprised the initial levels of the chain of command. Additionally, MPO Ferreira was still a member of the team.

CVB 000058

issues; therefore the investigation was temporarily put on hold. Then in late January 2012 she returned to Human Resources requesting that her complaint be pursued and the investigation resumed.[42]

Even after filing the internal complaint with Human Resources, she continued to make allegations of inappropriate behavior and potential safety violations against MPO Ferreira to her supervisors. Like all alleged safety violations, these assertions were taken seriously and forwarded to Internal Affairs for investigation. See IA 2012-011 summary report attached hereto as Exhibit T. The following allegations[43] were investigated by internal affairs:

1. MPO Ferreira took over training on January 11, 2012,
2. Her presumption MPO Ferreira failed to clear a kitchen on a January 14, 2012 building search because he failed to mention it in debrief,
3. MPO Ferreira intentionally spread his legs open limiting her space in the van the Team was squeezing into after the January 14, 2012 operation,
4. MPO Ferreira pushed MPO Kosmas out of play and forcefully pulled the suspect from an attic space on January 17, 2012 during a call out to assist the detective bureau in a building search for an armed robbery suspect,
5. The same day after the call out, MPO Ferreira asked who was assigned to City Council and ignored her response, and
6. MPO Ferreira undermined her joking with Officer Strouse by tossing a pen to Strouse and stating "here use my pen".

The investigation involved interviews with twenty-four current and former members of the SWAT Team. The investigation did not corroborate the allegations of inappropriate behavior or safety violations by MPO Ferreira. However, other concerns were raised by several officers who described that MPO Kosmas gets overwhelmed during stressful operations and operates in "condition black" which causes them concern for their safety. See Exhibit T.

In response to all of MPO Kosmas' allegations the City and Police Department reviewed the accusations taking into account the totality of the circumstances and took appropriate action as needed in an attempt to resolve the apparent constant issues. There simply was nothing further the Police Department could do to satisfy MPO

---

[42] Due to the length of the complaint, number of witnesses with relevant information and numerous documents to review, as well as staffing issues within Human Resources, the investigation did take quite some time. As the investigation was concluding, the City received MPO Kosmas' formal EEO Charge of Discrimination. At this time the preliminary findings failed to corroborate MPO Kosmas' allegations of gender discrimination or harassment by the three named individuals.

[43] The majority of the allegations were also raised in MPO Kosmas' internal complaint to Human Resources and thus were also a part of that investigation as well.

18

**Charging Party:** Nicole Kosmas
**EEOC Charge #:** 437-2012-00274

Kosmas. What the City and Police Department did not do is retaliate against her due to her claims. To date, MPO Kosmas has not been the subject of any discipline or other adverse employment action. She remains a Master Police Officer, a member of the SWAT Team and maintains the same terms and conditions of her employment. The record is simply void of any information which provides even a hint that there was any action taken in retaliation for her numerous internal complaints over a three year period or due to any other malignant motive.

## Conclusion

MPO Kosmas' assertions are unsubstantiated claims made by a disgruntled employee who refuses to accept the consequences of her own actions. Title VII does not guarantee a perfect workplace or provide a federal remedy for all offensive language, personality conflicts and disappointing decisions. MPO Kosmas has merely cobbled together isolated episodes to support her claim only one of which has any nexus to her gender. MPO Kosmas' conclusory allegations of discrimination and retaliation, alone, are insufficient to provide a basis for the claims raised in her Charge. Based upon the information compiled in response to the Charge and the Request for Information, the documented facts are void of any evidence of discrimination based upon Officer Kosmas' gender or retaliation in violation of Title VII. The City of Virginia Beach and Virginia Beach Police Department do not discriminate against their employees and did not discriminate against MPO Kosmas.

CVB 000060